HORACE M. RHODES, EXECUTOR, RESPONDENT, *v.* AMARILLA DUTCHER, AND OTHERS, APPELLANTS.

*Surplus moneys — payment to heirs of mortgagor — when decree directs deposit of surplus with county treasurer — remedy of creditors.*

Upon the sale of certain real estate under a decree of foreclosure entered in this action, the purchaser, in pursuance of an agreement with the widow and heirs at law of the deceased mortgagor, executed to them mortgages for their interest in the property after the payment of the specific liens thereon. These facts were reported to the court by the referee, and his report was confirmed. Subsequently this motion was made by the administrator of the deceased mortgagor and certain of his general creditors, to have the mortgage set aside, and the amount thereof paid over to the County Treasurer, as required by the decree of foreclosure. *Held*, that the motion should have been denied; that the rights of the general creditors could only be enforced in an action brought by the administratrix, and not by a motion or special proceeding.

Where, upon a sale under a decree of foreclosure, the referee, with the consent of the parties in interest, sells the premises on time, in order to obtain a better price, and such sale is reported to and approved by the court, the purchaser has a right to insist upon the terms of his purchase, and cannot be compelled to pay cash, when he bought on time. (Per LEARNED, P. J.)

APPEAL from an order made at the Special Term.

This was an action to foreclose a mortgage executed by Cornelius V. Dutcher. The mortgagor died April 28, 1868, intestate, and seized of the equity of redemption; and leaving surviving, his widow, Amarilla, and his three children, his heirs. This action was commenced in the spring of 1872, and was carried to judgment of foreclosure and sale. The sale took place June 8, 1872. The widow, the three heirs, and a subsequent mortgagee were parties. Two of the heirs were under twenty-one, and appeared by guardians *ad litem.*

The judgment was in the usual form, requiring the referee to pay the surplus to the county treasurer. On the sale, Andrew Purcell purchased the property. There was a surplus of about $1,100. Of this, something over $200 was paid by the referee to Dayton, the subsequent incumbrancer. For the balance, of about $900, the referee took mortgages, payable in annual installments of fifty dollars each, upon the premises sold. One of said mort-

gages was to the widow, being intended for her dower right; another to one of the heirs, Adelaide; and the others to the guardians *ad litem* of the infant heirs. The report of the referee stated the taking of these mortgages, and was confirmed May 23, 1873.

The widow and Adelaide have assigned their mortgages to Rhodes, the plaintiff in this action. The two infant heirs have become of age. One has assigned his mortgage to one Mann; the other heir has assigned his to Dayton.

On the 27th of April, 1874, Sanford Carlton was appointed administrator of Cornelius V. Dutcher, deceased; no administrator having been previously appointed.

The administrator now makes an affidavit showing that Dutcher owed about $1,740 at his death, and that his personal assets did not exceed $172.94; and he moves this court to require the purchaser to pay the surplus of the purchase-money to the surrogate; and that these mortgages be adjudged invalid and void, and be cancelled and annulled; and that the present holders of them pay to the surrogate the amounts they have received thereon.

The purchaser makes an affidavit that he bought in good faith, and without knowledge that Dutcher's estate had not been settled, or that the creditors had any claim; that he cannot raise the money on the mortgages without expense and loss.

Mann, the holder of one of the mortgages, says that he bought it in good faith, and paid about $200 therefor; that he had no knowledge that the estate was not settled; that the administrator is a brother of the widow, and knew of the purchase at the foreclosure, and advised the giving of the mortgages. Rhodes, the other holder, makes a similar affidavit.

One of the heirs makes an affidavit that Dutcher, at his death, was possessed of more personal property than enough to pay his debts, and specified over $700. He states that the alleged claims against Dutcher are not correct; that Sanford Carlton advised the widow not to take out letters of administration, and that for this reason none were taken out until the personal property had been nearly all used up.

On these affidavits the Special Term made an order June 28, 1875, requiring the purchaser to pay to the referee the balance of

the purchase-money on the mortgages, given to secure the heirs who sold; and the referee to pay the same to the county treasurer; and declaring the mortgages void, and modifying the order of confirmation, as respects the taking of the mortgages.

From this order the purchasers and the present holders of the mortgages appeal.

*R. C. Betts*, for the appellants.

*S. Thomas*, for the respondent.

LEARNED, P. J.:

The first question is, whether the purchaser can lawfully be required to pay this balance to the referee. Although it is customary to sell for cash, I see no reason why the plaintiff, at a foreclosure sale, may not direct the referee, if no one objects, to sell on time. A sale on time may be the means of obtaining a better price for the property. And when a referee, thus authorized, sells the property upon time, and such sale is reported to the court and confirmed, I think that the purchaser has a right to insist upon the terms on which he made his purchase, and that he cannot be compelled to pay cash, when he bought on time. If any wrong has been done, or fraud practiced, the utmost would be to have a resale, on notice to the purchaser, and upon such terms as would protect him from loss.

The purchaser was under no obligation to see that the referee made a proper disposition of the surplus; and, certainly, the purchaser cannot be required to perform any other contract than that which he made. He states in his affidavit that he gave more than he would have done if he had had to pay cash. I do not think that the special term could rightfully require the purchaser, against his consent, to pay the money secured by these mortgages, in any other way than according to their terms. While the sale stands, it must stand on the terms upon which it was made.

The other part of the order declares the mortgages unauthorized and void, except so far as it may be necessary to have recourse to the same to enforce collection to the credit of this action.

One of these three mortgages is in the hands of Rhodes, who

swears that he purchased the same in good faith, and that no motion papers have been served upon him. It is difficult to see how the court can take away his property without any service of papers upon him. He was the plaintiff in the action, it is true; but it was not as such plaintiff that he became the owner of this mortgage. That was a purchase made in March, 1874, about two years after the foreclosure sale. No proof of service of notice of motion appears in the papers. The authority of the attorneys could not continue.

Another of the mortgages is in the hands of Mann. He was not a party to the original action, nor was he a purchaser at the sale. He swears that he bought the mortgage about a year and a half after it was given. The order of the court, on a special motion, in an action to which he was not a party, takes away his mortgage by declaring it void. I do not think that this can be done in such a summary way.

Furthermore, Sanford Carlton, the moving party, is not a party to the action, and he has no claim on the moneys. He does not ask that they be paid to him, nor does the order so require. It is not pretended that he has any right to receive them.

At the death of Dutcher, the real estate vested in the heirs. They became the owners, and were such owners when the foreclosure sale took place. Suppose that, on the day previous to the sale, they had conveyed the real estate to a purchaser in good faith; would not the purchaser have acquired a good title, subject to the mortgage? More than four years had elapsed since the death of Dutcher, and no administrator had been appointed; and therefore an administrator could not have had a sale of the property by order of the surrogate. (See Laws of 1869, chap. 845.) I do not see, therefore, why the heirs might not have made an indefeasible conveyance of their estate in the lands on the day previous to the sale; and in that case the purchaser would have been entitled to receive the surplus. The very object of the statute was to limit the time within which creditors could enforce debts against real estate, and thus to end the difficulty suggested in *Hall* v. *Partridge* (10 How., 188).

Now, if the heirs might have conveyed the land on the day before the sale, so that the purchaser would have been entitled to

the surplus, it is inconsistent to say that they could not dispose of the surplus after that day, so as to give a good title to it.

It is true that the heirs still remain liable to the creditors of the deceased, personally, to the extent of the real estate descended to them. (2 R. S., [m. p.] 452, §§ 32, 33.) But even this liability depends on the fact that the personal assets were insufficient. (*Mersereau* v. *Ryerss*, 3 N. Y., 261.) And, furthermore, this liability does not affect lands which have been aliened. (Sec. 51.)

The provisions of the statutes are ample. Within four years after the death of the deceased the creditors, if there be a deficiency of personal assets, can, through the administrator or executor, and by the authority of the surrogate's court, compel a sale of the real estate. After that time they can only reach such as has not been aliened in good faith; still, however, having a right of action against the heirs, personally, in respect to what they have severally received.

In this present case, therefore, the heirs were entitled to receive the surplus as their own. And they could dispose of it; being, however, personally liable if there had been, in fact, a deficiency of assets. There is really a doubt in this case, whether there was a deficiency of assets. The largest alleged claim is that of the widow, Amarilla, who, it appears, continued after her husband's death to live on the farm, and who sold some of the personal property. This she did, according to the affidavits of the two witnesses, by the advice of Sanford Carlton, her brother, who has now, after the lapse of six years, taken out letters of administration. There are several other suspicious circumstances in this matter, unnecessary to state.

The order should be reversed; without prejudice, however, to any right of action of the creditors against the heirs, respectively, on account of the real estate which descended to them. And Purcell should have costs of the motion and of this appeal against Sanford Carlton, personally.

BOCKES, J. :

The proceedings in this case, from the time of sale under the decree of foreclosure, have been strangely irregular. The departure from the direction contained in the decree of sale has led to

difficulties, which it may be troublesome to overcome and remedy; still, the true way will be to start, in the examination of the case, with the first error committed in the proceedings, and see how correction may be now made from that point, holding in view the rights and equities of all concerned.

We will assume, as authorized to do, that the proceedings to the sale of the real estate, under the decree of foreclosure, were regular in all respects. Then, on such sale being perfected, the rights of all *persons* in the equity of redemption were barred; and the avails of the sale became a *fund in court*, to be applied in satisfaction of the legal and equitable claims thereon. So much as was necessary to satisfy the specific liens on the property sold was first to be applied, according to their priority. This was done, and to this extent the judgment was properly executed. Had there been no surplus, nothing would have remained to do. But there was a surplus, as is shown us, of about $900. According to the direction in the decree, this surplus should have been paid over to the County Treasurer. This was right in theory, and in practice; and had this direction been followed the fund would have been in court, in fact, to meet the just demands of those entitled thereto. Then it could not have been drawn out, except to answer the just and lawful demands of those having claims thereon, and it would have been the duty of the court to see that such claims were answered in the order of their priority, growing out of the relation of the claimants to the fund. Now it may be well to pause here and determine to whom this surplus fund belonged, for it is with this fund we are to deal, all rights in the real estate, as such, having terminated by the sale. This surplus, in law, belonged to the widow and heirs of the intestate mortgagor; the portion going to the heirs, however, being subject to the equitable claims of the general creditors of the intestate. Thus, we see, this fund was subject, *first*, to the claim of the widow thereon; *second*, to the claim of the general creditors of the intestate mortgagor; and, *thirdly*, what remained, if any, would belong to the heirs at law of the intestate, in equal parts. Had this surplus been paid into court, or, as directed in this case, into the hands of the county treasurer, to be disposed of under the order of the court, it would have been drawn out only to answer these claims, when determined in the order above stated.

And now, if the fund still remains in a condition to be reached, it continues subject to such claims. Here, difficulty perhaps, presents itself. · The widow took her share, and as to that part no question is here raised. But the balance was improperly passed over, in mortgages, to the heirs at law. Those mortgages still remain unpaid, in whole or in part, and in them rests this fund, to which the general creditors of the intestate were entitled. It may be well to remark here that it is not proposed to disturb the sale; no one asks to set that aside; nor is it a matter of any importance that Purcell, the purchaser, bought on time. This has nothing to do with the question of right to the surplus, inasmuch as it is *the fund* now existing in bonds and mortgages, to be paid according to their terms, on which the creditors make claim. If these securities still remained in the hands of the respective heirs at law of the intestate, to whom they were originally given, I have no doubt his general creditors might reach them, in a proper proceeding for that purpose, on showing a want of assets to meet the requirements of a due administration of his estate. Nor is it obvious, how an assignee of those securities can stand in any better position than would the assignor (57 N. Y., 229, 233; 50 id., 61; 47 id., 421); but that is not, I think, a question to be determined here. The question now is, whether this fund can be reached, and applied to the just claims of the creditors by a proceeding on special motion. I am of the opinion that the purpose sought cannot be thus attained. It must be by action, by the administrator, for the benefit of the general creditors; and this would be so, I think, even if· the securities had not been assigned. Generally, a fund raised for special purposes may be followed and secured, so long as it can be traced, except where it comes to the hands of some person or persons who may have obtained superior equities in regard to it. But the pursuit must be in form to give all parties interested a full and fair hearing, both on the facts and law. A special motion is but illy adapted to this end when facts are disputed and the equities complicated. The mortgages brought in question in this case should not be declared void on this proceeding. Indeed, I think, as the facts are here presented to us, that they should be allowed to stand, and that the moneys thereby secured to be paid should be the subject of litigation between the contending parties.

If I am right in this, the matters in controversy on this motion constitute a subject of formal action, or suit in equity, in which the heirs at law of the intestate and assignees of the fund should be made parties, and, perhaps, the widow, also, although, as it here appears, no claim is made against the share received by her. If the general creditors of the intestate can make it appear, through the administrator, whom the law has selected to represent them, that the fund, once subject to their equitable claim, remains within their reach, they may still have relief, but not by special motion to set aside the foreclosure sale, especially when it involves also, the right and title of bonds and mortgages, in which third parties have, or claim to have, acquired rights. The creditors of the intestate should be put to a proceeding by formal action. · It follows that the order appealed from should be reversed, and the motion made at Special Term should be denied. The costs of the motion and of the appeal should be against the administrator, as such. To charge him with costs personally would be, as I think, singularly unjust. There is nothing indicating bad faith on his part. He did nothing reprehensible, in seeking to secure the rights of those he was bound by law to protect.

Nor is this the place to determine the rights of the creditors against the estate. Carlton, as administrator, holds a position of duty to the creditors, which cannot be gainsaid here, on affidavits of third parties that some of the claims have been paid, or are fraudulent. Those questions must be determined in other proceedings, perhaps in another tribunal. He stands here as administrator, duly authorized, and, in fact, bound by law to protect the estate for the benefit of the creditors of the intestate. In the absence of palpable bad faith, he should not be charged personally with the costs of a proceeding taken in his official character, and under legal obligation.

The order appealed from should be reversed, with ten dollars costs and disbursements on appeal; and the motion made at Special Term should be denied, with ten dollars costs; such costs and disbursements to be against Carlton as administrator, and not personally.

Present — LEARNED, P. J., BOCKES and BOARDMAN, JJ.

Order reversed, with ten dollars costs and printing expenses, and motion denied, with ten dollars costs; costs to be paid by Carlton personally.